## JOHN B. SHAW v. THE STATE.

### No. 1422. Decided April 20, 1898.

**1. Continuance—Diligence.**

A total want of diligence is manifest in an application for continuance, where the absent witnesses resided out of the county and process for them was not sued out until the lapse of six weeks after defendant's arrest under the indictment.

**2. Same.**

To entitle a defendant to a continuance for absent witnesses who have been served, but are absent when the case is called for trial, it must be made to appear that, upon his ascertaining that they were not present, he immediately sued out additional process to secure their attendance during the trial.

**3. Same.**

A continuance will be held properly refused where the facts show that the proposed witness was absent from the locus a quo a distance of some seventeen or eighteen miles, and could not have seen what it was proposed to prove by him.

**4. Same.**

A continuance will be held properly refused where the proposed testimony of the absent witness would in no manner be inconsistent with the State's case nor the guilt of the accused.

**5. Same—To Impeach Witness for Truth and Veracity.**

A continuance will not ordinarily be granted for character witnesses; and in no case will it be granted to impeach a State's witness for truth and veracity by a single witness who lived in a distant county.

**6. Same—Irrelevant Testimony.**

On a trial for murder, it will be held that an application for continuance for a witness to prove that the day before the alleged murder defendant killed a beef, and there was blood on his pants, was properly overruled, the testimony being wholly irrelevant and immaterial, in view of the fact that the State offered no testimony of blood stains on the clothing of defendant.

**7. Same.**

An application for continuance for a witness to prove that he saw tracks made by a number 9 or 10 shoe near the dead body, presents irrelevant and immaterial testimony where the numbers of the shoes or boots worn by the defendant were not shown or sought to be established by any evidence in the case, or where such testimony would only harmonize with the State's testimony upon said matter.

**8. Same—To Impeach a Witness.**

A continuance will not ordinarily be granted for testimony to impeach a witness.

**9. Same.**

A continuance will not be granted for testimony which is not material.

**10. Severance of Defendants—Right to.**

The provisions of article 707, Code of Criminal Procedure, with regard to the right of joint defendants, or defendants separately indicted for the same offense, if complied with by filing a proper affidavit for the severance, are mandatory, and it is no valid objection to, nor can the severance asked for by a defendant be defeated by a

statement of the prosecuting attorney that he proposes to use such other defendant, who is asked to be first tried, as a witness against the defendant seeking the severance.

### 11. Refusal of Severance—Harmless Error, When.

An erroneous ruling in refusing a severance is harmless error where the record shows that subsequent to the ruling the defendant, for whose testimony the severance was sought, was tried and convicted for the same crime at the same term of the court, and that he had accepted his sentence and declined to appeal therefrom. And held, a reversal of the judgment on account of the erroneous ruling, under the facts. stated, could in no event benefit the defendant, inasmuch as he could never avail himself of the testimony of such convicted codefendant.

### 12. Severance—Affidavit for.

The statute providing for a severance of defendants requires the defendant seeking the severance to state in his affidavit positively that the testimony of his codefendant is material to his defense; and an affidavit which states that he *believes* the testimony of his codefendant would be material to his defense is insufficient.

### 13. Murder—Evidence—Harmless Error.

On a trial for murder, admitted evidence of the finding of a pair of boots in a barn some time after the homicide, though irrelevant, is harmless error where the guilt of defendant is otherwise established beyond any question.

### 14. Same—Irregular Procedure.

On a trial for murder, certain witnesses while testifying were requested to look out of the courthouse window, and were permitted to state that they saw three horses hitched outside near by which they recognized as the horses whose tracks they had measured and compared at the scene of the killing. Held, while the proceeding was irregular, the error was harmless.

### 15. Murder in the First Degree—Evidence Sufficient.

See the opinion for a condensed but vivid summary of facts which the court hold amply sufficient to support a verdict and judgment for murder in the first degree, inflicting the death penalty.

APPEAL from the District Court of Johnson.  Tried below before Hon. J. M. HALL.

Appeal from a conviction for murder in the first degree; penalty, death.

The following narrative statement of the case, which is correct, is taken from the brief of counsel who represented the State on the trial below, viz:

The facts developed on the trial of this case, briefly stated, are substantially as follows:  Thomas P. Crane, the deceased, was a young man, about 23 or 24 years old, and about the last of August or the first of September, 1897, he, with his wife and three small children, moved upon the Pierce ranch, located in Johnson County, Texas, having accepted employment to gather a crop of cotton growing on said ranch, and to keep the ranch house, and board the other employes of the owner, C. A. Pierce. At that time, and before the killing, appellant John B. Shaw was the manager of said ranch for the owner, Pierce; and as such manager was in charge of the direction and management of same in Pierce's absence. The only other employe about said ranch from the time of Crane's employment thereon up to the killing was one A. R. Ginn, who was a general utility man about the place.

On the 2d day of November, 1897, the deceased, Crane, went to the field, situate about a mile from the house, for the purpose of picking cot-

ton. He was never afterwards seen alive. His body was discovered on the 5th day of November, 1897, on the side of a hill in what is known as the "Jungle pasture," on said ranch, and at the inquest held on him three gunshot wounds, each of which was a fatal wound, was found on the body of the deceased, and in addition to these wounds the skull had been crushed in with some blunt instrument. On the day the body was discovered the appellant, John B. Shaw, was arrested, charged with the crime, together with a negro man by the name of Lee Wilson. These wounds were made with a 38-caliber ball, and balls of a larger caliber, supposed to be 44. The wounds on the head, from their size, shape, and general appearance, it may be presumed from the testimony, were made with the end of a rifle, the magazine and barrel thereof inflicting the wounds.

From the testimony it clearly develops that within a short time after Crane went to the ranch the appellant, Shaw, became enamored of his (Crane's) wife. He had at different times stated to the witness Ginn that he intended to have Mrs. Crane, and on one occasion stated that he would secure Mrs. Crane if he had to kill Tom Crane and all of his damned relations. He had on one occasion, three or four weeks prior to the murder, made improper proposals to Mrs. Crane, and had gone to the extent of making an assault on her. He had stated to Mrs. Crane that it was his desire to provide her a better home than she was then enjoying, offering to care for her and her children in a handsome style. All of these insinuations, proposals, and this assault, had been by Mrs. Crane repelled. The deceased had been made aware of the assault on his wife. He and the appellant had quarreled about it a short time before the murder. After the disappearance of Crane on November 2d, and before the discovery of his body, the appellant renewed his attentions to Mrs. Crane, stating to her that her husband had run away and left her, and that he could and would care for her and the children. He had also stated to the witness Ewing that Mrs. Crane was "stuck on him," and his actions displayed at this time showed that he was infatuated with Mrs. Crane.

On Monday night before the murder of Crane on Tuesday a negro by the name of Lee Wilson came to the ranch and spent the night. Before going into the ranch house on that night he went with appellant Shaw to the lots, where they remained about half an hour. On Tuesday morning he was again seen with appellant Shaw in conversation about the house and in the yard. There has long been on this ranch a Winchester rifle, 44 caliber. Appellant was the owner of a Colt's sixshooter, 38 caliber. On the morning of the murder the only persons about the ranch were the deceased and his family, John B. Shaw, the negro Wilson, and the witness Ginn.

Crane left for the field about 7 o'clock a. m., riding a colt a little more than two years old. Shaw left for the gin, about three miles distant, at about the same time, with a wagon, going for cotton seed. The negro Wilson left about half after 8 o'clock, going no one knows where, taking with him the Winchester rifle, and riding horseback. The witness Ginn

left the ranch about 9 o'clock in a two-horse wagon, coming to the city of Cleburne, about eighteen miles distant from the ranch, bringing a load of meat with him to the home of the ranch owner, C. A. Pierce. This left, so far as the testimony shows, no one on the ranch but Crane, who was supposed to be at the field, his wife and little children, who were at the ranch house.

Before leaving for the gin Shaw instructed the witness Ginn to leave the horses in the lot that he did not use; that on his return from the gin he wanted to salt the cattle.    There was left in the lot only one horse—this a little black pony known as "Button." Shaw returned from the gin at fifteen minutes to 10 o'clock. He inquired of Mrs. Crane the time. It was stated to him; and to the children in Mrs. Crane's hearing he stated that he was going to salt the cattle. He returned to the house at thirty-five minutes after 12 o'clock. No one saw the horse that he was riding except the negro Wilson.

The deceased, Crane, was decoyed away from the field where he was at work, evidently about 11 o'clock a. m., probably a little earlier. This is demonstrated by reason of the fact that he had picked about sixty pounds of cotton. An average day's picking by him, when the cotton was better than it was at the date of the murder, was 175 to 180 pounds.

It here becomes important to describe the Pierce ranch. It is situated about eighteen miles southwest from Cleburne, the county seat; contains five or six thousand acres of land under fence, and is located in the brakes of the Brazos River. The ranch is in a very rough country—hills, hollows, canyons, and ravines. The hills, being dignified in the record by being called mountains, are found on the ranch. It is composed of what is known as the "north and south pastures" and the "Jungle and Buck pastures." The field is only composed of about 60 acres. We find the canyon heading near this field.

It now becomes also important to describe the horses, which it will be found unmistakably figured in this tragedy. The little black horse left in the ranch lot by Ginn, and known as "Button," was a trained cowpony, 7 or 8 years of age, and made a very peculiar track. He was shod on his fore feet. On one of the feet the shoe was smooth; on the other foot the shoe had calks, referred to by some of the witnesses as "corks." His hind feet were bare. Having been shod for some time, the hoofs of his fore feet had grown until they had extended out over the shoes. The horse ridden by the negro was known as "Arkansaw," and was also a trained cowhorse. His feet were also peculiar. In his right fore foot there was a gap of about one and a half inches in diameter caused by a snag of the hoof from a barbed wire. In his hind feet the horse was pigeon-toed, and cut the dirt when traveling, throwing it out from his feet. The colt ridden by Crane was an ordinary colt, had no qualifications of a cowpony, or otherwise developed up to the time of the tragedy.

After the body was discovered and a search was instituted for tracks, it was found that the little black horse known as "Button" and the colt ridden by Crane left the field going together, and traveled to the head of

the hollow or canyon, until they arrived near a point where the "Arkansaw" horse had stood for some time. They were there joined by the "Arkansaw" horse. The three horses crossed the head of the hollow, and traveled together for some little distance, when the tracks of the Crane colt go down into the bed of the canyon followed by the tracks of the "Arkansaw" horse, the tracks indicating that the horses were running. They come out again and are joined by the "Button" pony, and here you find the first evidence of a race for life that ended in a race to death. The three horses traveled on together, over a country that can scarcely be described. Over hills, ravines, canyons, and jungles, for nearly a mile, and to the scene where the body of Crane was found.

Now, from the record and from the testimony of all of the witnesses, it is made unmistakably and beyond the possibility of a doubt to appear that the men who rode the "Arkansaw" and the "Button" horses were the men who murdered Crane. From the spot where the body was found, the "Arkansaw" horse and the Crane colt go together to a point distant about 200 yards in the jungle, where evidence is found showing that the Crane colt was tied and left standing for twenty-four hours. This spot in the jungle pasture is about one and a half mile from the ranch house. On Tuesday night Mrs. Crane persuaded Shaw to go and make a search for her husband, or for the horse. He finally went; was gone about one-half an hour, and returned with the message that there was no tidings of either. Mrs. Crane sat up most of the night. Shaw stayed up as long as she did. The first thing in the morning Mrs. Crane once more prevailed on Shaw to go and look for her husband's horse. He went; was gone a short time, and returned with the message that it could not be found. Mrs. Crane then insisted that he go and get her a horse, in order that she might secure the assistance of one of the neighbors to assist her in the search for this horse and in search for the missing man, Crane. Instead of doing that, Shaw again went in search for the horse. In a half hour he returned to the house with the colt ridden by Crane when last seen alive. The colt was gaunt, and showed the effects of standing without food or water. Shaw claimed to have found the colt grazing at a point where there was no obstacle to keep the colt from returning to the ranch lots where it had been fed and watered during the residence of Crane at the Pierce ranch. In other words, he found in a half hour this colt, near the scene of the body—a place that it required three days for many neighbors to discover after diligent and careful search—a search that Shaw never at any time participated in, claiming that he had to haul cotton seed and had no horse to ride. Yet no cotton seed was hauled after the murder, and Shaw was on a horse riding to Cleburne every day that week. On Tuesday it develops that a man named Wylie, a resident of Johnson County, happened near the ranch about the noon hour, at thirty-five minutes after 12 o'clock, and dined with Shaw and Mrs. Crane. On Thursday and Friday the officers of the county were joining in the search. Shaw had been talking to them for a day or two. He had tried

to persuade the sheriff on Friday morning that it was no use in his going to the ranch; that Crane had run off, and left his wife. The sheriff insisted on going. Shaw was at the ranch on Thursday night, and from the number of people that were gathering in to assist in the search, evidently believed that some discovery would be made. Instead of assisting, himself, we find him on Friday making every effort to find Wylie. He sees him on Friday evening. He makes careful and painstaking examination of Wylie to ascertain whether or not, while on the ranch about Tuesday, he saw Crane about the field, or anyone else about there. In other words, he understands that Wylie is the only one who it was possible may have discovered anyone in company with Crane, and is anxious to ascertain whether he did, evidently believing that if Wylie could not throw some light on his secret, that no one could.

After leaving Wylie, he again starts to the ranch. When within two miles from there he meets some young men and makes inquiry, having first told that he learned of the discovery of the body; the inquiry being as to whether or not the officers are there, and are doing any tracking. He goes on, arrives at the ranch, where he is arrested.

The body, then, has been removed to the ranch house. The officers take the back track of the horse that he rode to the ranch house. They find the track of this horse leading to a place within about 400 yards of where the body was found, and 400 or 500 yards off the road. Again, on the day the body was discovered, Shaw can go to the scene of the murder without inquiry, while it required others three days to learn the scene where the murder was committed. And on this Friday evening of his arrest he is found in possession of apples and children's shoes,—with these little attentions, returning to the scene of his affections, with the evident purpose of continuing his suit for the hand of Mrs. Crane, and causing her to believe that he was her friend, and that her husband had most cruelly deserted her. This record, on the question of motive, as well as that of positively identifying the three horses by the tracks that lead to the scene of the murder, is doubtless more clear and positive than any record ever submitted in a case of this kind. The horses' tracks are positively identified by twelve or fifteen witnesses, both for the State and for the defendant. About that there can be no possible controversy. That deceased was killed with a rifle gun and with a pistol there can be no controversy. That the pistol was a 38 caliber, and that Shaw owned a pistol of that kind, is also undisputed. That this little black "Button" horse was left in the lot for Shaw to ride; that he returned to the house about 10 o'clock and did ride the same horse away is also undisputed. The team that he drove to the gin was a pair of mules. That he was the man with the motive for the killing of Crane will appear in the record much stronger than in this narrative detail of the testimony.

In addition to these circumstances, which are undisputed, we have the testimony of the negro Lee Wilson. His testimony corroborates every circumstance; corroborates every physical fact on the ground; corroborates

every wound found on the body of the deceased; and, aside from these circumstances that had pointed unmistakably to the cruel, savage, and brutal manner of the taking off of Crane, his testimony discloses a crime that for brutality and savageness has never been disclosed by a record submitted to this court in this State.˙ It belongs to the atrocity and savagery of the Apache Indians, or some other fierce tribe of savages in the long ago.

His testimony discloses the fact that this man Crane was lured from his field where he was at work, unarmed and unsuspecting, to near the head of the canyon, where the negro lay in wait, and that almost immediately after the appellant came up with the negro the deceased was made aware of the end that awaited him, and along this journey of more than a mile to the scene of his death begged piteously for his life, and made every effort to escape from his captors; but, being carried through the country that has been described, on an untrained colt, he had no show for his life, herded in as he was by the trained cow horses and the skilled riders and unerring marksmen, as Shaw and the negro were shown to be.

These, as stated, are briefly the circumstances of the killing; are not overdrawn, and will more clearly appear from an inspection of the record than has been stated.   It is not practicable to point out these different circumstances by reference to pages in the transcript, hence a narrative form has been adopted by the writer hereof. It may be added that every fact and every circumstance in this case is left undisputed, and from the record it will be disclosed that appellant's counsel made no mistake, strong as the circumstances were, corroborated as they were by appellant's principal and accomplice, Lee Wilson, when they were allowed to go unchallenged and unquestioned.

Defendant Shaw made an application for a severance from his codefendant Lee Wilson, who was indicted separately for the same offense. The motion for severance is as follows:

"Now at this time comes John B. Shaw, defendant in the above entitled cause, and files his affidavit in writing, and states to the court that one Lee Wilson is indicted for the crime of murder by separate indictment in this court, and that the said defendant is indicted for the same murder by separate indictment filed in this court, and that the said offense is alleged to be the same transaction of both parties, and that the said defendant believes that the evidence of the said Lee Wilson is material to his defense, and that affiant verily believes there is not sufficient evidence against the said Lee Wilson to secure his conviction, whereupon he prays the court that the said Lee Wilson shall first be tried herein.

"J. B. SHAW.

"Subscribed and sworn to before me, this January 3, 1898.

"R. B. VICKERS,

"Clerk District Court Johnson County, Texas."

This motion was overruled by the court and defendant saved a bill of exceptions.

At the time said application and motion of appellant for a severance was presented to the court, the attorneys for his codefendant asked of the court leave and time to prepare a counter-affidavit and motion praying that the appellant be first placed on trial. The court was also assured of the fact by the State's counsel that the codefendant, Lee Wilson, would be used as a witness by the State in said case, and that appellant would not be deprived of his testimony by reason of the overruling of said application. Said Lee Wilson was used as a witness on the trial of said case, and at a later day of the term of said court said Lee Wilson was placed on trial and convicted of murder in the first degree, sentenced, and no appeal taken from said sentence.

After his application for severance was overruled, defendant made an application for continuance, which was also overruled. The principal matters connected with this application for continuance are sufficiently stated in the opinion below.

Over the objections of defendant, the witness Mossy Pierce, daughter of C. A. Pierce, after she had stated that she lived with her father at Cleburne, Johnson County, Texas, about eighteen miles from her father's ranch, and that she was acquainted with defendant Shaw, was permitted to testify, "that some weeks after the killing of Thomas P. Crane, while I was playing in the cotton seed house belonging to my father, I found a pair of boots buried in the cotton seed about two and a half feet deep."

Appellant also objected to the testimony of Mrs. C. A. Pierce, to the effect that her daughter Mossy had brought her the pair of boots mentioned in the testimony above.

The objection to the testimony of these witnesses was that the same was immaterial and irrelevant and prejudicial to defendant, he not being in any manner connected with said boots. But the court overruled the objections upon the promise of counsel for the State that the State would, by other evidence, connect defendant with said boots. This promise was not complied with by counsel for the State. During the trial, when the witnesses H. F. Long and Joe Osborne were each upon the stand testifying, and after each had testified to having followed the tracks of three horses in Pierce's pasture going to and returning from the place where they saw the dead body of the deceased (Crane) lying, the prosecuting attorney asked them the question: "If they recognized the three horses then and there?" and the court over objection of defendant allowed each witness, after he was asked the question, to leave the witness stand and go about ten feet to the south window of the courtroom, and after looking out of the window, to answer that he identified said three horses which were then hitched in a bunch at the south gate leading into the courthouse yard, which was not more than forty feet from said window. Defendant's objection was that the actions of the witnesses were sensational and calculated to prejudice the minds of the jury.

*Featherstone & Hall,* for appellant.—The court erred in overruling defendant's application for severance and refusing to place the codefendant, Lee Wilson, first on trial.

The court will observe by the bill of exception number 1 that the reason assigned by the trial court in his explanation for the overruling of said application for a severance is one not authorized by law, for the trial court acted upon the statement of the attorney representing the State that the State would use the codefendant as a witness for the State, and that said codefendant was used by the State as a witness, etc.

The said reason given by the trial court in his explanation for overruling the application to sever is unknown to the law, and absolutely in defiance of law. Code Crim. Proc., art. 707; Price v. State, 40 S. W. Rep., 596; King v. State, 35 Texas Crim. Rep., 472; Forcey v. State, 29 Texas Crim. App., 308.

The court erred in permitting the witness Mossy Pierce to testify that some weeks after the killing of Crane, while playing in the cotton seed house of her father, in Cleburne, Texas, she found a pair of boots buried in the cotton seed, about two and a half feet deep.

The said statement of said witness shows that some weeks had elapsed since Crane's death and the time of the finding of said boots, and the record further shows that appellant was never connected with said boots in any manner, though counsel for State promised the court by other evidence to connect appellant with said boots. Said testimony should have been excluded from the jury. Marshall v. State, 5 Texas Crim. App., 273.

The court erred in permitting the witness Mrs. C. A. Pierce to state that some weeks after the killing of Crane her daughter, Mossy Pierce, brought to witness a pair of boots at their house in the city of Cleburne, Texas. Marshall v. State, 5 Texas Crim. App., 273.

The court should have excluded from the jury the said statement of the said witness, because, in view of the other evidence in the case, showing that appellant, on the day after the alleged killing, was at witness' house and the statement by counsel for the State that appellant's connection with the said boots by other evidence would be shown later on, and the utter failure of the State to connect appellant with the said boots at any time or place, it tended very strongly to prejudice appellant's case before the jury.

The court erred in allowing the witnesses H. F. Long and Joe Osborn to testify and act in the manner that said witnesses did, as set out in bills of exceptions numbers 5 and 6.

The testimony and actions of said witnesses did not tend in the least to establish the guilt of appellant, but on the contrary tended very strongly to prejudice the minds of the jury against appellant.

All the testimony given by other witnesses in the case fully identified the three horses, viz., Arkansas, Button, and the Crane colt, and the placing of the said horses at the south gate of the courthouse yard, opposite

the two south windows, where a part of the jury trying appellant could see said horses, should not have been permitted by the court.

The actions of said witnesses Long and Osborn in going to the window, looking out, and identifying the said horses was a very sensational proceeding, and unauthorized by law, as the whole proceeding was simply done for the purpose of prejudicing the minds of the jury against the appellant.

This brief of counsel was also supplemented by a most able argument upon the above assigned errors, and especially upon the error of the court in refusing defendant's application for a severance, which argument can not be reproduced owing to its length, and can not be condensed without doing injustice to its force and effect.

*Ramsey, Brown & Odell,* and *F. E. Johnson,* County Attorney of Johnson County, for the State.—The motion for severance as it appears of record in this case is wholly insufficient in law, not in compliance with the statute, and fatally defective in more respects than one, and should have been overruled and denied by the lower court on account of want of essential allegations under the statute, and was properly overruled by the court, for that if no other reason.

It will be seen from an inspection of said affidavit and motion, and from the article of the statute under which it was attempted to be drawn, that there is an insufficient identification of the charge of murder stated therein with which the affiant and his codefendant were indicted, as alleged therein, and the particular offense, if any, for which defendant was on trial at the time this motion was presented, and it is not stated affirmatively in said motion that the offense is the same transaction with which both parties are charged. In lieu thereof, said affidavit states that said offense is "alleged to be" the same transaction of both parties, without stating who alleges it to be the same transaction, making same fundamentally erroneous in not affirmatively showing that the offense charged is in fact the same transaction with which both defendants are charged.

Said affidavit and motion for severance is totally insufficient and fatally defective in this: Article 707 of the statute requires the affiant and the defendant seeking a severance to state affirmatively that the testimony of the witness whose evidence he seeks is material to his, affiant's, defense. The affidavit and motion in question states that the said defendant "believes" that the evidence of the said Lee Wilson is material to his defense.

The statute requires and demands of one or more codefendants, separately indicted, when praying for a severance, to affirmatively state that the evidence of the party whose testimony they seek is material. This is evidenced and emphasized in the article quoted that this affirmative showing must be made. For in the sentence following in said article, it is only necessary for the affiant, whoever he may be, seeking a severance, to make a showing that he verily believes there is not sufficient evidence to

convict his codefendant. There is a vast difference between knowing a thing and believing it.

The court did not err in overruling said application made for a severance, and properly held that it ought not to be granted, inasmuch as appellant would have the benefit of his codefendant's testimony, and inasmuch as his codefendant was having prepared at the time a counter-affidavit to have appellant first tried, and inasmuch as said codefendant was afterwards tried and convicted of murder in the first degree, receiving a life sentence, and no appeal was taken from said conviction. Thompson v. State, 34 S. W. Rep., 630; Reed v. State, 11 Texas Crim. App., 514.

The court did not err in overruling said application for a continuance, but entered a proper order thereon. The said application showed that no diligence had been used to procure the testimony of any of the witnesses whose testimony was sought, in so far as said testimony was material to any issue in this case. The record will disclose the fact also that had they testified, as set out in said application, that said testimony would have been false and disbelieved by the jury in so far as it was material to any issue in said case. Said application further shows that the testimony of the witnesses sought was untrue, where it was shown to have been material, and the utter lack of any diligence to procure the same showed that it was merely made to bring about delay in the trial of this case.

The testimony of Mrs. C. A. Pierce and Mossy Pierce with regard to the boots found in the cotton house some time after the murder, if evidence it can be called, was inadmissible, unless its materiality should have been made to appear. This much is conceded and confessed, but the erroneous admission of evidence which is neither pertinent nor material to an issue in the case and which could have no tendency whatever to affect or prejudice the rights of the defendant, is not cause for reversal, even in a capital felony. Post v. State, 10 Texas Crim. App., 579; Sadler v. State, 20 Texas Crim. App., 195; Bond v. State, 20 Texas Crim. App., 427.

As to the court's permitting the witnesses Long and Osborne to look out of the window and identify the horses, it is always permissible to allow a witness to identify, if he can do it, any object about which he is testifying. The above testimony was competent and material, and the very best testimony to test the recollection of the witnesses and their knowledge of the tracks about which they were testifying, and their identity of the horses.

*Mann Trice,* Assistant Attorney-General, for the State, also filed a very able argument in support of the brief of his co-counsel for the State.

HURT, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; hence this appeal.

Appellant presented a motion for a continuance on account of the absence of the following witnesses: Walter Nobles, Mrs. Bill Masengale,

Mrs. Short Calahan, Mary Fitzgerald, all of whom were alleged to reside in Johnson County; and Bob Gipson and Mrs. Bob Gipson, residents of Hill County; and George Ginn, a resident of Williamson County. The indictment was returned on the 18th of November, 1897. Appellant was then under arrest. Process was only issued for the witness Gipson on the 31st day of December, 1897, and was returned into court on the 3d of January, 1898, the day set for the trial of the case. The return showed that these witnesses could not be found in Hill County. No excuse is shown for not having the process issued earlier, but appellant allowed about six weeks to elapse after his arrest under the indictment before the use of any diligence to secure these witnesses. If they were in Hill County, the use of proper diligence might have secured their attendance, or, if not, the process could have been returned, and appellant would then have had time to have informed himself as to the whereabouts of said witnesses, and procure process to such county for them. Process for the witness Ginn was not issued until the 1st of January, and the application showed that it had not been returned at the time the case was called for trial. No excuse is shown for the failure to sue out this process earlier. It is not shown when the process was issued for the witnesses who resided in Johnson County, nor is it shown when the same was returned. It was shown that they were served, but were absent when the case was called for trial. Appellant should have immediately sued out additional process, and by this means he might have secured their attendance at the trial. We do not believe the diligence used for any of said witnesses was sufficient.

It is alleged that appellant expected to prove by the witnesses Gipson that they saw one A. R. Ginn riding in company with Lee Wilson in Clem Pierce's pasture, between 9 and 10 o'clock on the day of the homicide, and that appellant was not in company with said parties, and further expected to prove by them that said parties owned horses shod with a "cork shoe" on one foot and a smooth shoe on the other. This statement is couched in very general terms. There were several pastures belonging to Clem Pierce, and it is not stated in which pasture they were. The State's proof showed that the homicide occurred in the Jungle pasture, and the proof is beyond any question that Ginn left the ranch about 8 o'clock, in a wagon containing some beef, en route to Cleburne, some seventeen or eighteen miles northeast. This was not only sworn to by Ginn, but by Mrs. Crane. There is also testimony of other witnesses showing that he reached Cleburne about 12 o'clock that day, and remained there the balance of the day and night, returning to Clem Pierce's pasture the next day. The fact that said parties may have owned horses shod with a cork shoe on one foot and a smooth shoe on the other, does not, in the light of the State's testimony, signify anything. If it be conceded that the statement here shows a horse shod similar to the tracks of the one found in the pasture, then it is entirely consistent with the State's case; for, unquestionably, Lee Wilson was in the Jungle pasture

on that day, and participated in the homicide, and either he or appellant rode a horse shod in that manner.

As to the testimony of George Ginn, by whom it was expected to prove the bad character of A. R. Ginn, the State's witness, for truth, it is sufficient to say that a continuance will not ordinarily be granted for character witnesses. No evidence as to this matter was offered at all by the appellant, though the witness had lived in that neighborhood for some time. If his reputation was bad, it is singular that but one witness existed by whom such fact could be proved, and that he lived in a distant county.

As to the testimony of Mrs. Masengale, her evidence would not have been relevant, as the State offered no testimony of blood stains on the clothing of appellant.

Nor would the testimony of Nobles have been relevant. The fact that he saw tracks apparently made by a No. 9 or 10 shoe near where the dead body was found would harmonize with the State's testimony. Moreover, the State made no issue as to this matter. The number of the boots or shoes worn by the appellant or Wilson was not shown by any evidence.

Appellant stated that he expected to prove by Mrs. Fitzgerald that Mrs. Crane told her at some time (though the time is not stated) that on the day of the homicide appellant was absent from the house but a short time. This statement does not raise any issue. The length of time is not stated. The fact is that, when we look at the record in this case, the surprise is that he was absent from the house on that day such a short time to have committed the homicide in the manner it is shown to have been accomplished. At the most, this was merely impeaching evidence, and a continuance will not ordinarily be granted for this character of testimony.

We have carefully examined the application for a continuance, and, in our opinion, it does not show diligence; nor, when taken in connection with the testimony adduced, does it appear to us to show that the absent testimony was material, and the court did not err in overruling the application for a continuance.

Appellant made a motion for a severance between himself and one Lee Wilson, who he alleged was indicted for the same offense. We quote said motion as follows: "Now, at this time, comes John B. Shaw, defendant in the above entitled cause, and files this his affidavit in writing, and states to the court that one Lee Wilson is indicted for the crime of murder, which is the same offense charged against this defendant, by a separate indictment in this court, and that said defendant believes that the evidence of the said Lee Wilson is material to his defense, and that affiant verily believes that there is not sufficient evidence against the said Lee Wilson to secure his conviction," etc. The court overruled this application, and appended thereto the following explanation, to wit: "That, when the motion to place Lee Wilson on trial was first made by the defendant Shaw, said Wilson's attorneys objected, and asked that they have time to file a motion to first put Shaw on trial, and, while they were pre-

paring said motion, the prosecuting attorney (Odell) stated to the court that the State would use Wilson as a witness. The court then overruled the defendant Shaw's motion to have Wilson first tried, and Wilson was used as a witness by the State, and was afterwards (at the present term) tried and convicted, and has not appealed from a verdict of murder in the first degree and life sentence. To all of this, appellant reserved his bill of exceptions, and has assigned this action of the court as error." If Wilson had prepared a counter-affidavit, requesting the court to first try appellant, in order that he might avail himself of his testimony, under article 707, Code of Criminal Procedure, then it would have been optional with the judge to have made his selection as to whom he would first place on trial. But this was not done. Instead thereof, the motion was overruled on the assurance of the district attorney that he would place Wilson on the stand as a witness for the State. Under the statute, which has been held mandatory (see King v. State, 35 Texas Criminal Reports, 472; Willey v. State, 22 Texas Criminal Appeals, 408), appellant had the right to insist upon Wilson being tried first, he making the proper affidavit for that purpose. It was no response to his motion that Wilson would be placed on the stand as a witness. He had a right to have Wilson tried first, and, if acquitted, he might use him as a witness, unburdened by the pending prosecution against him,—a right for him to testify as any other citizen, free from the particular charge, he being acquitted thereof, and not testify under a cloud, and perhaps believing that, by testifying strongly against the appellant it would go easier with him in his case. But concede that there was error in overruling the motion to sever, still, we can not imagine, under the facts of this case, how a reversal upon that ground should be awarded appellant. The explanation to the bill shows that Lee Wilson was tried at that term of the court, convicted of murder in the first degree, and sentenced to the penitentiary for life, without any appeal. Now, if we should reverse the judgment, it is evident that the appellant could never use Wilson as a witness. Again, if we look to the record, eliminating Wilson's own testimony, we are firmly convinced that if he had been placed on trial first, according to the request of the appellant, he would have been convicted, and appellant would never had secured his testimony in any shape. So it occurs to us that the application here made was not made in good faith to secure the testimony of this witness, but was made for the sinister purpose of depriving the State of the use of his testimony on the trial by conviction; and we do not understand the statute to mean this. We would not be understood as holding that, when the statute is complied with, the court has any option in the matter, but it is the court's duty to grant the severance; but we do hold that, whatever may have been the error of the court below in refusing the severance, a reversal of this case on that account can be of no possible benefit to the appellant, as he can never avail himself of the testimony of his codefendant. We would further observe in this connection that, while a severance under this article is a matter of right, the statute should be strictly complied with. The statute requires

appellant to state in his affidavit, as a matter of positive averment, that the testimony of his codefendant will be material to his defense. This was not done. The affidavit merely stated that he believed the testimony of said Wilson would be material to his defense.

Appellant assigns as error the action of the court in admitting certain testimony as to the finding of a pair of boots at the barn of Clem Pierce, near his residence in Cleburne, some time after the alleged homicide. While an objection to this testimony should have been sustained, as its relevancy nowhere appears, still we fail to see how it could possibly have affected the defendant injuriously.

Appellant also objected to certain witnesses, while on the stand, at the request of the district attorney, going to the window and looking out, stating that they recognized the three horses said to have been ridden by the parties at the time of the homicide. And in that connection it is stated that some of the jury could also look out of the window, and see the horses. These horses were thoroughly identified by other witnesses as being the horses ridden by the parties at the time of the homicide. It may have been somewhat irregular for the witnesses to testify in the manner they did, that they saw certain horses hitched in the courthouse yard, which they identified as being the horses whose tracks they had previously measured and compared. But we make the same observation with reference to this matter as above,—that we fail to see how the testimony could work any injury to the appellant. The mere fact that they saw certain horses within view, and recognized them as the horses whose tracks they had measured and compared, was harmless.

We have carefully examined the record, and it establishes the guilt of the defendant beyond any question. Lee Wilson, the accomplice, testified positively and directly to the facts attending the killing, and even if we eliminate his testimony, and consider the case solely upon the circumstantial evidence, the guilt of the defendant is established with that degree of certainty required by the rules regulating that character of testimony. The circumstances inherently leave no hypothesis consistent with appellant's innocence, but show conclusively and to a moral certainty that appellant, with his companion Lee Wilson, and no other persons, committed the murder. The record before us shows a most atrocious murder, rarely equaled in the annals of any country. The only motive assigned is that appellant coveted the wife of Crane, the deceased. He was the manager of Pierce's ranch; and the deceased, his wife, and three small children were living on the premises, the appellant boarding with them. According to his own account, he was having a liaison with Mrs. Crane, but, not content with this, sought to have her entirely to himself by putting her husband out of the way. We gather from the testimony that he had been brooding over this matter for some time, for evidently Lee Wilson came to the ranch, stayed all night on the 1st of November, to be in readiness on the morning of the 2d, in pursuance of a conspiracy. Wilson went to the woods, and stationed himself, while appellant hied to the field, where the deceased was engaged in picking cotton, and there

decoyed or forced him to mount his horse, and accompany him to the point where Wilson was in waiting. There these parties, armed, forced the deceased to go into a thickly wooded pasture (as significant of its character, it is called the "Jungle pasture") ; and thence the testimony shows that they forced him along the canyon, and to a remote and thicketed portion of the same. En route, appellant cursed and abused him, and told him that he intended to kill him. Twice deceased attempted to escape, but they pursued and overtook him. Appellant shot him in the back. He fell from his horse. The parties got down and put him on his horse again; and, when he had proceeded into a dense thicket, appellant again shot him twice with his Winchester. Not content with this, after he had fallen upon the ground, he broke his skull in five or six places with his gun. The parties then separated, Wilson taking a circuitous route back to Cleburne, and appellant returning to the home of the deceased, and then coolly sitting down with the family, and eating dinner. As stated above, few cases equal this in horror, and none surpass it. King David, when he sacrificed Uriah, in order to possess himself of his wife, placed him in the front of the battle. He was armed, and had some chance for his life; and, if he fell, he would at least perish honorably, in the defense of his country. But here, instigated by the same character of motive, appellant gave his victim no opportunity whatever. He forced or decoyed him from his labor in the field into the jungle, there not to engage in equal combat, but re-enforced by another, with gun or pistol, set upon and shot him to death, unarmed and helpless, and while fleeing for his life. In our opinion, no punishment can be too severe for one who, after having claimed to have debauched the wife, decoys her husband into a jungle, and murders him in the brutal and cowardly manner disclosed in this record. The jury simply did their duty in visiting upon him the highest penalty of the law. We find no error in the record requiring a reversal of the judgment, and it is accordingly affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]