Harry Wilson v. The State.

No. 1662.   Decided June 26, 1913.

Rehearing denied June 27, 1913.

</div>

**1.—Burglary—Sufficiency of the Evidence.**

Where, upon trial of burglary, the evidence sustained the conviction under a proper charge of the court, there was no error.

**2.—Same—Severance—Affidavit—Testimony.**

Where the motion for severance was not sworn to by either party, and did not state that the testimony of the party to be placed on trial first was material for the defendant, the same was correctly overruled.

**3.—Same—Evidence—Identity of Property Stolen—Bill of Exceptions.**

Upon trial of burglary, there was no error in introducing testimony that the owner of the alleged stolen property examined the same and told the jury how it compared with that lost by him; besides, the bill of exceptions was defective.

**4.—Same—Evidence—Bias of Witness.**

Upon trial of burglary, there was no error in permitting the State to show that the defendant's witness was the father of a co-defendant, and there was no error in the court's failure to limit this testimony.

**5.—Same—Objections to Charge of Court—Practice on Appeal.**

Where the objections to the charge of the court were not raised by bill of exceptions or on motion for new trial, they could not be raised for the first time in appellant's brief.

**6.—Same—Explanation—Purchase—Charge of Court.**

Where, upon trial of burglary, the defendant claimed that he purchased certain property of the same kind as that alleged to have been stolen from the brother of the owner, and the court submitted this issue by a proper charge, there was no error in refusing a special charge directing a peremptory acquittal.

Appeal from the District Court of Bosque. Tried below before the Hon. O. L. Lockett.

Appeal from a conviction of burglary; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*J. W. Taylor* and *J. P. Word,* for appellant.—On question of insufficiency of the evidence: Holmes v. State, 49 Texas Crim. Rep., 348, 91 S. W. Rep., 588; Barnett v. State, 80 S. W. Rep., 1013; McDonald v. State, 79 S. W. Rep., 542.

*C. E. Lane,* Assistant Attorney-General, and *H. S. Dillard,* County Attorney, for the State.—On question of severance: King v. State, 35 Texas Crim. Rep., 472; Anderson v. State, 56 id., 360.

PRENDERGAST, JUDGE.—The appellant was indicted for burglarizing by force, threats and fraud a house, the barn of John Ivy, on July 28, 1911, with the intent to steal. He was convicted and given the lowest penalty, two years in the penitentiary.

The evidence to show appellant's guilt was circumstantial. The court gave a correct charge on circumstantial evidence. Appellant contends that the evidence is insufficient to sustain the verdict. We have carefully read and studied the evidence and in our opinion it is amply sufficient to sustain the verdict.

It is unnecessary to give a detailed or extensive statement of the evidence. We will merely give what the evidence tends to show and what the jury from all the evidence was justified in finding.

Appellant lived with his father, Bill Wilson, on his farm. The night the burglary and theft occurred Bill Wilson was at Waco and was not at home. The farms of John Ivy and Bill Wilson adjoined. It was about, or a little less than, a mile and a half between their residences, by the public road. John Ivy's barn was situated at his residence and near thereto; the barn of Bill Wilson was situated near his residence.

John Ivy had a brother, Bill, who was entirely blind and almost entirely deaf. He could not hear an ordinary conversation and could not hear out of one ear at all. In order to make him hear out of the other ear it was necessary to get very close to him and talk loud. Bill Ivy lived with John and had for many years. John Ivy had some shelled sacked oats in his barn. A short time before the burglary and theft, John Ivy and his wife had gone to Mineral Wells and were there on the night of the burglary. He left in charge of his place and property Lee Greason. When he left to go to Mineral Wells John Ivy fastened the outside window to his barn where his oats were by a button from the outside, a staple and wired up on the inside, and in addition, a plank nailed across the window on the inside, the plank being nailed on either side of the window and through the window, thereby apparently securely fastening this window.

A brother of appellant, who lived some quarter of a mile from Bill Wilson, had an old wagon and a team of small mules. These mules had very small feet. This wagon and team were at Bill Wilson's the night of the burglary. On the night of the burglary appellant's cousin, Dan Davis, stayed all night at Bill Wilson's. Dan was sick and soon after supper early in the night, went to bed. He did not go to sleep for some half hour after he went to bed. Soon after supper appellant told Dan Davis to look after himself that he was going up to his said brother Pink's. Ag Standifer, another cousin of appellant, was also at Bill Wilson's that night. When appellant told Dan Davis to take care of himself he,—and the evidence justified the jury to believe,—and Ag Standifer then left Bill Wilson's place. They did not go to Pink's, where appellant had announced to Dan Davis he was going.

Bill Ivy was well known to appellant and he had known him for several years. Bill Ivy stayed about the negroes, Bill Wilson and others a good deal. John Ivy had notified them repeatedly not to permit him to stay about them. On the night of the burglary, Greason went to bed about 9 o'clock. Bill Ivy was not there then and had not been there prior to that time that night. Between 9 and 10 o'clock after Greason had gone to bed he heard some noise out about John Ivy's barn. It sounded to him like knocking and prizing. Soon afterwards he heard a wagon drive away from John Ivy's barn. He did not then go outside to see what, if anything, was the matter. About thirty minutes later he did get up from the bed and went out to the barn. He looked about the barn but saw no one and no wagon. In going out to the barn, however, he met Bill Ivy about a well in the lot, had no conversation then with Bill Ivy. After finding no one about the barn, he went back and went to bed, not knowing that anything particular had occurred until the next morning between daylight and sun-up. Bill Ivy also went to the house and went to bed, not in the bed or room with Greason. The next morning a tenant living on John Ivy's farm, who came to Ivy's lot to feed his team, found that the outside door of John Ivy's barn had been bursted open and he saw oats were missing out of the barn. He notified Greason. Greason then went out and made an examination. They found the outside window of John Ivy's barn bursted open, the plank nailed up had been torn off, the wire or staples broken or pulled out and they then found loose scattered oats on the ground under this window, and from there tracked a wagon, drawn by animals that had very small feet to Bill Wilson's barn. The said old wagon was then in Bill Wilson's lot near his barn. They found loose shelled oats in this old wagon and on the ground at Bill Wilson's barn. In his barn they then found at least eight sacks of oats. Greason then inquired of Dan Davis where Bill Wilson was. The appellant was then in Bill Wilson's house and heard what occurred between Greason and Davis, but did not make his appearance. Upon being informed that Bill Wilson was in Waco and had been the day and night before, Greason left. Later in the day he and others went back to Bill Wilson's barn.

They then found no oats in sacks but found loose shelled oats piled up in Bill Wilson's bin in his barn. Digging down in this pile they found two different colored kind of oats. That on top corresponded with the color and grade of oats raised by John Ivy that year and which were taken out of his barn the night before. Those underneath were a brighter, lighter grade of oats and readily distinguishable from that on top, and the oats underneath were also identified and shown to be of the same grade and color of oats that Bill Wilson had raised and thrashed that year.

From all this it will be readily seen that the evidence unerringly pointed to the appellant as one of the persons, at least, who committed the burglary and theft. At any rate, it was amply and clearly sufficient to justify the jury to convict appellant as the party, or one of the parties.

It seems that P. A., or Ag Standifer, as well as appellant, was indicted under a separate indictment for the same burglary. When the cause was called for trial said Standifer and appellant made a motion for severance with the view of having Standifer tried first so that appellant could use his testimony on his trial. This motion was not sworn to by either party and it did not state that the testimony of Standifer was material for appellant. The motion was correctly refused by the court on both of these grounds as stated by the judge in allowing the bill excepting to the overruling of said motion. Art. 729, C. C. P.; Shaw v. State, 45 S. W. Rep., 597.

While John Ivy was testifying for the State he was asked whether or not he made any examination of the oats in the Wilson crib, and if so to tell the jury how the oats compared with the oats in his bin. The appellant objected to this because it was in the absence of the defendant and called for a conclusion of the witness. This was a mere objection to the evidence and not a statement of fact that the appellant was absent. The bill is wholly incomplete, but the evidence was clearly admissible whether appellant was present or absent, and the testimony did not call for a conclusion of the witness. The witness testified that he examined the oats and in his judgment they were exactly like the oats in his granary.

Hilry Standifer, the father of said Ag Standifer, gave testimony in appellant's behalf which was against the State's case. In order to show his bias in favor of appellant, the State was permitted to ask him if his son, Ag Standifer, was not also indicted for committing this burglary, and he replied that he was. Appellant complains of this testimony and also complains that the court failed to limit the purpose for which this testimony was introduced. Clearly the testimony was admissible to show the witness' bias and prejudice in appellant's behalf. Earles v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181; Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611. And the court did not err in giving a charge limiting the effect of this evidence. The fact that Ag Standifer was indicted for this burglary would clearly be a circumstance in appellant's favor, but whether so or not, the jury

could not possibly have been influenced to base a verdict against appellant because another party was indicted for the burglary.

By several grounds of the motion for new trial appellant attacks the court's charge and excepts to the refusal to give certain special charges requested. We have considered all of these. In addition to appellant's complaint in his motion for new trial to the charge of the court, in his brief he raises other questions which were not raised in the court below. It is too well settled to need citation to the cases that such objections first made in this court, can not be considered. In order for the appellant to have such questions considered here he must have made such objections either by exceptions to the charge of the court at the time given or in the motion for new trial, and when not so made this court can not consider them.

The theory of the appellant by all of his complaints to the charge of the court and said special charges requested and refused, is that the appellant bought four sacks of John Ivy's oats from Bill Ivy, John's brother, and because Bill Ivy lived at John's and had a key to John's barn, that appellant could not be guilty of burglary. The sole evidence on which appellant bases his theory is that he had Greason to testify on cross-examination, over the objections of the State, that he (Greason) had a conversation with Bill Ivy the next day after the burglary at night, and that Bill said he sold Harry Wilson, the defendant, four sacks of oats and that it amounted to $8, and that he would divide the money with Greason if Greason would not tell his brother, John Ivy, about it. On cross-examination by appellant of John Ivy, John Ivy swore positively that Bill Ivy did not tell him at any time that he had sold appellant four sacks of oats, but flatly denied any such thing. Appellant did not testify and neither did Bill Ivy.

The effect of appellant's contentions and objections to the court's charge on this point was that he was entitled, in effect, to a peremptory charge that if the jury believed appellant bought four sacks of John Ivy's oats from Bill Ivy and got them from John Ivy's barn that night, that he could not and would not be guilty of burglary. Instead of so charging, the court correctly submitted that issue to the jury in two separate paragraphs of the fourth subdivision of the court's charge, as follows:

"Now, if you believe from the evidence beyond a reasonable doubt that the defendant, Harry Wilson, was a principal with Bill Ivy and with one Ag Standifer, and that said parties or any two or more of them agreed to act together in the taking of the oats from said barn by entering the same through the window, or in entering the same from some other way and taking said oats from the said window, if you believe they did do so, and that the defendant knew at the time that he did so, that the said Bill Ivy did not own said oats or did not have authority to sell the same, then you are instructed that the said parties so acting together would be principals within the meaning of that word as herein defined.

· "On the other hand, if you believe from the evidence that Bill Ivy owned said oats or that he had authority to sell the same, or that under all the facts and circumstances under which defendant received the said oats, if he did so, he honestly and in good faith believed that said Bill Ivy had authority to sell said oats to him, then you are instructed that the defendant would not be a principal with the said Will Ivy, and would not be bound by his acts in the breaking of said barn, if he did so, and in that event you will find him not guilty."

This, in our opinion, correctly submitted the theory of the appellant as it should have been submitted.

As shown above, these oats were taken out of John Ivy's barn in sacks in the dead hours of the night by forcibly breaking open the well-fastened and nailed-up window of John Ivy's barn, and the evidence justified the jury to believe that appellant took the oats to Bill Wilson's barn and placed them therein at night. It was satisfactorily shown that the wagon and team at Bill Wilson's was used to haul these oats. Early the next morning eight sacks of John Ivy's oats were found in Bill Wilson's barn. All the evidence justified the jury to believe that appellant was at least one of the parties who did this. He could not either honestly or in good faith have believed that Bill Ivy had the authority to sell him four sacks of these oats. The evidence all repels such an idea. In addition, after the particular sacks of John Ivy's oats were found in Bill Wilson's barn the next morning and before other witnesses went there in the evening so as to further examine and identify them, they were taken out of the sacks and emptied on a pile of Bill Wilson's oats in Bill Wilson's bin and the sacks themselves were not found by the witnesses. Somebody, and the jury were clearly authorized to believe that appellant was that person, emptied these sacks and made away with them and attempted to hide or disguise the stolen oats by emptying them loose in Bill Wilson's bin in his barn. Appellant is bound to have known that Bill Ivy had no authority whatever to sell his brother, John Ivy's oats to him at night and forcibly take them out of John Ivy's barn at night.

In our opinion there is no reversible error shown in this record, and the judgment will be affirmed.

*Affirmed.*

[Rehearing denied June 27, 1913.—Reporter.]